RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0158P (6th Cir.)
File Name: 04a0158p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KENNETH FARHAT,
    *Plaintiff-Appellant,*

    *v.*

JANET JOPKE, in her
individual and official
capacity; MAUREEN KELLY,
in her individual capacity;
PAM HOOD, in her individual
capacity; TROY SCHOOL
DISTRICT,
    *Defendants-Appellees.*

No. 02-1896

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-72333—John Corbett O'Meara, District Judge.

Argued: December 11, 2003

Decided and Filed: May 28, 2004

Before: ROGERS and COOK, Circuit Judges;
BERTELSMAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Timothy M. Holloway, Taylor, Michigan, for Appellant. Ernest R. Bazzana, PLUNKETT & COONEY, Detroit, Michigan, William F. Young, WHITE, SCHNEIDER, BARID, YOUNG & CHIODINI, Okemos, Michigan, for Appellees. **ON BRIEF:** Timothy M. Holloway, Taylor, Michigan, for Appellant. Ernest R. Bazzana, PLUNKETT & COONEY, Detroit, Michigan, William F. Young, Jeffrey S. Donahue, WHITE, SCHNEIDER, BARID, YOUNG & CHIODINI, Okemos, Michigan, for Appellees.

_____

## OPINION

_____

BERTELSMAN, District Judge. The Appellant, Kenneth Farhat, appeals from the district court's grant of summary judgment to the defendants. This action arises from the termination of Farhat from his position as a custodian for the Troy School District.

Farhat raises four issues on appeal: (1) he was discharged in retaliation for exercise of his First Amendment rights; (2) he was denied due process when the school board refused to grant a post-termination hearing in which he could deal directly with the board; (3) an order not to speak to other employees was an invalid prior restraint on his speech; and (4) Appellee Hood is liable under a conspiracy theory for

_____

[*] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

providing information to Appellee Kelly to aid in unlawfully depriving Farhat of his rights. The district court found that no constitutional violations had occurred and granted defendants' motions for summary judgment. For the reasons set forth below, we AFFIRM the judgment of the district court.

## FACTUAL BACKGROUND

Appellant Kenneth Farhat was employed as a custodian by the Troy School District for approximately 15 years. He was discharged on September 18, 2000 and initiated this lawsuit against the school district, its superintendent, an assistant principal, and a fellow custodian who is also a union representative. Appellant brought this action pursuant to 42 U.S.C. § 1983.

Appellant's employment history is significant and factors into the asserted justification for the actions of the school district. Appellant had a checkered employment history with the Troy School District. The record reflects that, from at least 1997 forward, Appellant had a history of confrontational behavior as well as hostile and accusatory communications directed toward the school district, its officials, co-employees and toward persons affiliated with the union. Appellant received numerous warnings and other discipline in response to specific behaviors that school officials found to be disruptive to, and inappropriate for, the working environment.

Appellant typically responded to such corrective action with a letter, usually directed to the author of the warning or reprimand. All of Appellant's responses contained primarily personal opinions and conclusions that were directed against specific individuals with whom he had had a disagreement. For example, Appellant routinely referred to others as "sick and demented," "ignorant and abusive," "mentally ill," "mindless criminals," "liars," "lazy and pampered," "alcoholic," "insane," "ignorant," "dysfunctional," "mentally ill freak," "jack ass," and similar terms. The context of such

epithets will be addressed later in this opinion in greater detail.

In January 1997, Appellant, then a union steward, attended a grievance meeting. The record reflects that his behavior at the meeting was inappropriate and threatening to others. Appellant received a warning letter from the Superintendent that explicitly explained to him that this type of conduct would not be tolerated and, if it continued in the future, that he could face more severe sanctions, up to and including termination.

In April 1998, Appellant received another written reprimand for his conduct toward the school district's executive director and a secretary. His conduct was described as obnoxious, loud and threatening. In response, Appellant claimed that the statements of the executive director were lies and were intended as discrimination against him due to his affiliation with the union. He claimed that he did not lose control but that it was the school official who lost control at the meeting.

In May - June of 1999, officials of the Michigan Education Association ("MEA" or "the union") corresponded and discussed their concerns about an upcoming union meeting with Appellant and his potential for workplace violence. They expressed concern about their safety and stated that they were seeking outside support and information about what options they had to protect themselves if Appellant became violent.

In January of 2000, Appellant wrote a letter to the Superintendent claiming that he was going to sue the district for libel and slander. He also claimed that he was forced into a meeting where he was threatened with discipline for having a weapon at a union meeting and at the workplace. Appellant further asserted that these "liars" and "cowards" had continued to attack his reputation and that he intended to sue. Again in January of 2000, Appellant threatened to file

grievances and to take additional action because he did not get what he wanted.

Yet again, on February 24, 2000, Farhat wrote to the "incompetent administration" claiming that he was wrongfully denied a position because he threatened lawsuits and grievances. He also stated that he had been wrongfully disciplined for uncooperative behavior. He claimed it was others who were uncooperative, not he, as he was "the best custodian in Troy Schools . . ." and "the best union representative in Troy Schools, bar none."

On February 24, 2000, there was a significant incident between Appellant and another employee/union representative, Appellee Pam Hood. Appellant's actions in regard to this incident precipitated his termination. On this occasion, Appellant was clearly unhappy about being denied a position he wanted. Appellant phoned Hood, while she was at work, and claimed that this was her fault. Within a short period of time, Farhat called Hood a second time and allegedly threatened her. Hood interpreted Farhat's threats as threats of violence. Appellant allegedly made statements such as, "When I get through with you, you won't be driving a bus or doing custodial work." Afraid to leave the room for fear that Appellant was coming to the building to follow through on his threats, Hood contacted a school official who instructed her to contact the police. Hood then locked herself in a room until the police arrived.

The following day, Appellant was suspended with pay to allow for an investigation of the February 24, 2000 incident.

On March 21, 2000, a meeting was scheduled for Appellant to have an opportunity to explain his behavior. Present at this meeting were Appellant, Assistant Principal Maureen Kelly, and Assistant Superintendent Mike Williams. Appellant was represented at the meeting by union representatives Joe Cusmano, Dominic Asaro and Mel Sledzinski. However, due to Appellant's uncontrolled, explosive and rude behavior, the

meeting was recessed at the suggestion of his union representative. Appellant was given several opportunities to speak privately with his representatives before they decided to end the meeting.

Another hearing was held on April 14, 2000. In a letter from the Superintendent, Appellant was advised that after two written reprimands for inappropriate behavior and two disciplinary hearings, he would be given yet another chance. However, because the school district found Appellant's behavior to be threatening, intimidating, and disruptive, it gave him the option of attending an anger management course, plus a 10-day suspension without pay, or 15 days without pay if he did not attend the anger management course. Appellant was instructed not to speak to other employees during his suspension. In this letter, moreover, Appellant was specifically advised that further conduct of this nature would not be tolerated.

On May 11, 2000, Appellant responded by letter, stating that he considered the letter from the Superintendent to be a "joke," and claiming that it was illegal. He claimed that all the allegations against him were lies. He claimed that Hood, other employees, and the school officials had been plotting against him. He stated that he has the flawed character trait of talking "fast and loud" and that this trait was being used against him.[1]

This letter is filled with vituperative remarks about the school district, specific employees, the union and specific union representatives, and claims of collusion and corruption. The same can be said of his previous letters and conduct. The letter is not specific with regard to the charges of collusion or corruption.

---

[1] The full text of this letter is attached hereto as Appendix A.

On May 18, 2000, Appellant sent a letter to Lu Battaglieri, the union president. In this letter, Appellant complained that his union representatives did not investigate his complaints as he believed they should. He also claimed they were purposefully not investigating because they were in collusion with the school district. He referred to Hood as a "demented and sick human being" and stated that he, Farhat, was the "only honest union representative in the city." He also referred to the Assistant Principal, Appellee Maureen Kelly, as "mentally ill."

Appellant further stated that he believed the union representatives were creating obstacles for the express purpose of covering up corrupt contract negotiations; preferential treatment of the corrupt representatives resulting in privatization, loss of bidding rights, loss of seniority rights, unwarranted discipline, loss of medical benefits, and loss of sick days; and a hostile environment of dissension and chaos. He claimed that he was disciplined because he chose to expose the union's and the representatives' collusion with the employer. He did not offer any examples of his allegations of corruption against the union except for what had happened to him.[2] Appellant copied this letter to three other union officials, including Hood. Hood, concerned about the statements in the letter, turned it over to the Superintendent.

On June 1, 2000, Appellee Maureen Kelly wrote to Joseph Cusmano, a union representative, and stated, "We have serious concerns about what Mr. Farhat has written and we need to meet with him so that he has a due process hearing." As Appellant was on medical leave, these officials decided to wait until he was released to return to work to continue the investigation and hold a due process hearing.

On September 18, 2000, Appellant was terminated from his employment. The letter of termination from the

---

[2]The full text of this letter is attached hereto as Appendix B.

Superintendent, Appellee Janet Jopke, stated that Appellant "crossed over the line" in his letter of May 18, 2000, and that he is "simply incapable or refuse[s] to recognize the inappropriateness of [his] conduct." The Superintendent specifically stated that she was not concerned with Appellant's statements about the union or union representatives. However, his statements and comments about school officials and employees were "abusive," "caustic," and "grossly insubordinate" to her prior warnings and directives, specifically her April 17, 2000 letter.

On November 1, 2000, following Appellant's filing of a grievance regarding his termination, a grievance hearing was held. Present for the hearing were Appellee Kelly, Steven Amburg for the union, the attorney for the school district, Craig Lange, and the attorney for Appellant, Jerry Haymond. Appellant failed to appear at this hearing. The hearing proceeded in his absence, however, and the grievance was denied.

On November 6, 2000, Appellant demanded arbitration. Pursuant to his request and the collective bargaining agreement, the case proceeded to arbitration before a neutral arbitrator. The record before the court does not provide the exact date of the arbitration. However, the record does show that Appellant attended the arbitration, as did representatives of the school district and the union. The parties reached a tentative settlement on all claims, with Appellant present. However, the settlement was subsequently rejected by Appellant. Thereafter, the union withdrew its representation of him.

Appellant's next challenge to the school district was to file this lawsuit. The United States District Court for the Eastern District of Michigan, Southern Division, heard Appellant's motion for partial summary judgment, Hood's motion to dismiss or for summary judgment, and the remaining defendants' motions for summary judgment (the school district and officials named therein). The district court held

that Appellant's speech was not protected, that there was no constitutional violation upon which to base a § 1983 claim, and that all defendants were entitled to summary judgment.

This appeal followed.

## STANDARD OF REVIEW

As this case is before us on appeal from the district court's grant of summary judgment, our review is *de novo*. *Equitable Life Assur. Soc'y v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" as to an essential element of the non-moving party's case. Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if a reasonable person could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where there are no disputed, material facts, we determine, *de novo*, whether the district court properly applied the substantive law. *See Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1345 (6th Cir. 1991).

## FIRST AMENDMENT RETALIATION

To establish a prima facie case of First Amendment retaliation under 42 U.S.C. § 1983, Appellant must demonstrate that: (1) he was engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a "substantial" or "motivating factor" in the adverse action. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2000) (citations omitted).

The framework for analyzing a First Amendment retaliation case is well-established. In *Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003), this court recently summarized this analysis:

> While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)(citing *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed 2d 570 (1972)), a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions. *See United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 475 n. 21, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). Therefore, in determining whether a public employer has violated the First Amendment by firing a public employee for engaging in speech, the Supreme Court has instructed courts to engage in a three-step inquiry. First, a court must ascertain whether the relevant speech addressed a matter of public concern. *See Connick v. Meyers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If the answer is yes, then the court must balance the interests of the public employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed. 2d 881 (1968). Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Perry*, 209 F.3d at 604.

*Id.* at 596.

In the case now before the court, it is not contested that Appellant's letter of May 18, 2000, culminating the events described above, was a substantial and motivating factor in his termination. The letter of termination from the Superintendent to Appellant specifically stated that he was being terminated for the expression in that letter, as well as for other specific instances of unacceptable conduct. This meets the third step of the test as outlined above: that Appellant's expression in the May 18 letter was a motivating factor in the adverse employment action.

There remain for our consideration the other two steps of the inquiry, the public concern step and the *Pickering* balancing test.

**PUBLIC CONCERN**

Whether the speech at issue involves a matter of public concern is a question of law for the court, *Bonnell v. Lorenzo*, 241 F.3d 800, 809-10 (6th Cir.), *cert. denied*, 534 U.S. 951 (2001), although there may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated. *See generally Waters v. Churchill*, 511 U.S. 661 (1994). Our review of the lower court's decision on this issue is *de novo. Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995).

The district court here did not expressly rule on the public concern issue, but seemed to base its decision on the *Pickering* balancing inquiry noted above. However, this issue has been raised by all parties to this appeal.

In determining whether expression is a matter of public concern, we are guided by *Connick v. Myers,* 461 U.S. 138 (1983), which we have noted is "the Supreme Court's most instructive case on this issue." *See Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1050 (6th Cir. 2001), *cert. denied*, 537 U.S. 813 (2002).

In *Connick*, an assistant prosecutor, upset over her pending transfer within the New Orleans District Attorney's office, circulated a questionnaire to her fellow employees soliciting their views on various issues. These issues included "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. The Court held that, of the several topics raised by the questionnaire, only the matter of pressure to work in political campaigns was a matter of public concern. The Court observed:

> When employee expression cannot be *fairly considered as relating to any matter of political, social, or other concern to the community*, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

*Id.* at 146 (internal citations omitted) (emphasis added).

The Court further instructed that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. Moreover, the entire speech does not have to address matters of public concern, as long as some portion of the speech does so. *Id.* at 149.

Applying this content-based test, the Court concluded that the "focus" of the assistant prosecutor's questionnaire, with the exception of the question pertaining to pressure on employees to work on political campaigns, was her personal

dispute with her superiors over the proposed transfer and thus was not a matter of public concern:

> While discipline and morale in the workplace are related to an agency's efficient performance of its duties, *the focus of [plaintiff's] questions* [in the questionnaire] *is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors.* These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause célèbre.

*Id.* at 148 (emphasis added).

Summarizing this ruling, the Court stated:

> We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147.[3]

In the twenty-one years since *Connick*, this court has had numerous opportunities to apply that decision to determine when a public employee's speech is a matter of "public concern." In so doing, we have recognized that the most difficult cases to adjudicate are "mixed speech" cases, i.e., those in which the speech for which the employee claims First Amendment protection arises in the context of an employment grievance or other personnel dispute, but where

the employee claims that some part of the speech also touches upon matters of public concern.[4]

The difficulty of determining whether speech is of "public concern" is compounded by the fact that these cases tend, as one might expect, to be highly fact-specific. However, our close review of *Connick* and this circuit's subsequent decisions yields the following principles:

1.  Speech is of "public concern" if it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.[5]

2.  The fact that the public employee engages in the speech while in the course of his or her employment does not preclude a finding that the speech touches upon a matter of public concern.[6]

---

[3] The Court held that the one issue it found to be a matter of public concern was not actionable because plaintiff's case failed to pass the *Pickering* balancing test. *Id.* at 154. *See* discussion, *infra*.

[4] *See, e.g., Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 894 (6th Cir. 2003); *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 716 (6th Cir. 2001); *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir.), *cert. denied*, 534 U.S. 951 (2001). *See also Leary v. Daeschner*, 349 F.3d 888, 899 (6th Cir. 2003). Indeed, as we noted in *Bonnell*, *Connick* itself was a "mixed speech" case because, although the Court did not use that label, it looked at every act of expression on the employee's questionnaire and, after concluding that one of the questions touched upon a matter of public concern, proceeded to the *Pickering* balancing test. *See Bonnell*, 241 F.3d at 811 n. 7.

[5] *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (citations omitted); *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 893 (6th Cir. 2003).

[6] *Rodgers,* 344 F.3d at 598-99 (eschewing the "course of employment gloss" on the *Connick* analysis); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1052 (6th Cir. 2001) (holding that although teacher was speaking in her role as an employee when she presented information on the environmental benefits of industrial hemp, the speech nonetheless related to matters of political and social concern to the community), *cert. denied*, 537 U.S. 813 (2002).

3.  The employee's motive for engaging in the speech in question is a relevant, but not dispositive, factor when considering whether an employee's expression is of public concern.[7]

4.  Although First Amendment protection might not be available if the employer can show that the public employee knowingly or recklessly made false statements, a public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment.[8]

---

[7] *Rodgers*, 344 F.3d at 600 ("Although Plaintiff's underlying motive in writing the memo might have been to complain about incompetent management, our duty is not to discern her underlying motive, but rather to evaluate her point as it is presented in the speech."); *Taylor v. Keith*, 338 F.3d 639, 645 (6th Cir. 2003) ("The inquiry is primarily concerned with what the speaker intended to communicate through his statement, and not his reasons for speaking.") (citation omitted); *Cockrel*, 270 F.3d at 1052 ("Thus, even if a public employee were acting out of a private motive with no intent to air her speech publicly, as was the case with Myers, so long as the speech relates to matters of 'political, social, or other concern to the community,' as opposed to matters 'only of personal interest,' it shall be considered as touching upon matters of public concern.") (quoting *Connick*, 461 U.S. at 146-49); *Bonnell*, 241 F.3d at 812; *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 575-76 (6th Cir. 1997).

[8] *Rodgers*, 344 F.3d at 601 n. 5 ("We note that even if Plaintiff's opinion ultimately proved to be incorrect, this does not deprive her statements of First Amendment protection."); *Chappel*, 131 F.3d at 576-77 (rejecting defendants' argument that employee's speech alleging corruption and unethical conduct cannot address matters of public concern absent proof of the truthfulness of his speech); *Williams v. Kentucky.*, 24 F.3d 1526, 1535-36 (6th Cir.) (rejecting argument that plaintiff's admission that she "couldn't prove" her allegations of unethical conduct foreclosed conclusion that her speech was of public concern), *cert. denied sub nom Allen v. Williams*, 513 U.S. 947 (1994).

We emphasize here, as we did in *Chappel*, that this principle is not in conflict with our opinion in *Barnes v. McDowell*, 848 F.2d 725, 734-35 (6th Cir. 1988). In *Barnes*, the employee alleged *in his complaint*

---

In "mixed speech" cases, application of the second and third principles is often difficult. That is, if the employee speaks only in the course of his employment and does so solely for personal reasons, when will the speech be of concern to the community?

Taking the motive issue first, our opinions are clear that, consistent with the "content" test of *Connick*, the pertinent question is not *why* the employee spoke, but *what* he said:

The defendants' most sweeping argument is that *none* of Chappel's speech may be considered speech on a matter of public concern because *all* of his speech was fundamentally and predominately motivated by his self-interest in obtaining a position as a paramedic with the ambulance district. . . . They also suggest that Chappel "lashed out against Chief Welch and the rest of his family," alleging misappropriations, nepotism, and a conflict of interest, only because "he believed that they were standing in his way."

The defendants' argument, that Chappel's subjective motivations are dispositive when determining whether his speech addresses a matter of purely personal concern, is in direct conflict with the Supreme Court's holding in *Connick*. In *Connick*, a public employee disseminated a questionnaire "to gather ammunition for another round of controversy with her superiors" because she was "dissatisf[ied] with a transfer." *Connick*, 461 U.S. at

---

that he had made accusations of corruption against his public employer, but discovery revealed that his actual speech included no such allegations, only complaints of mismanagement. *Id.* Thus, because the employee had failed to substantiate the allegations *of his complaint*, i.e., to produce evidence that he actually accused his employer of corruption, we found proper the district court's conclusion that the speech in question was not a matter of public concern. As we explained in *Chappel*, this does not mean that an employee who does, in fact, engage in speech alleging public corruption has to prove the truthfulness *of that speech* in order to show it touches upon a public concern. *Chappel*, 131 F.3d at 576-77.

148, 103 S.Ct. at 1691. Notwithstanding the fact that this personal grievance motivated the entire questionnaire, the Court concluded that "[o]ne question in [the] questionnaire . . . touch[ed] upon a matter of public concern." *Id.* at 149, 103 S.Ct. at 1691. We agree, as a majority of the Third Circuit recently concluded, that "[i]f motive were dispositive, the [Court's] inquiry [in *Connick*] could only have resulted in finding either that all of [the employee's] speech was public concern speech or that none of it was." *Azzaro v. County of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997) (*en banc*). . . .

> *[T]he inquiry into what a speaker intends to communicate remains fundamentally different from an inquiry into why the speaker intends that communication. The former inquiry is of much greater significance in determining whether speech addresses a matter of public concern.*

*Chappel*, 131 F.3d at 574-75 (italics in original; underlining added). *See also Bonnell*, 241 F.3d at 817 ("However, even assuming that Plaintiff was motivated by personal animus in circulating the *Apology*, the fact remains that in doing so, he addressed a matter occurring at the college which was of public concern.").

As for the "course of employment" issue, this circuit has flatly rejected the argument that the fact that a public employee's speech occurs while he is carrying out his job duties renders the speech of only private concern, noting that such a rule would eviscerate First Amendment protection in public employment. *See Rodgers,* 344 F.3d at 598-99; *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1052 (6th Cir. 2001), *cert. denied*, 537 U.S. 813 (2002). *Cf. Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 898-99 (6th Cir. 2003) (Gibbons, J., concurring).

Against the background of *Connick* and these principles, our circuit has distilled the "public concern" test by stating

that the court must determine: the "focus" of the speech; "the point of the speech in question"; "to what purpose the employee spoke"; "the intent of the speech"; or "the communicative purpose of the speaker." *See Rodgers,* 344 F.3d at 600 (holding that pertinent inquiry is "the point or focus of the speech in question"); *Taylor v. Keith*, 338 F.3d 639, 645 (6th Cir. 2003) (noting that proper inquiry is the "point of the speech" and "what the speaker intended to communicate"); *Buckley v. City of Portage*, No. 98-1783, 1999 WL 777542, at *4 (6th Cir. Sept. 16, 1999) (examining "primary focus" of speech), *cert. denied*, 530 U.S. 1262 (2000); *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1187-88 (6th Cir. 1995) (court must look to the "point" of the speech and the "communicative purpose" of the speaker); *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412-13 (6th Cir. 1994) (court must examine "complete record" and determine "focus" of statement for which employee claims protection), *cert. denied*, 515 U.S. 1142 (1995).

As a corollary to this "focus" test, we have held that the proper inquiry is *not* what might be "incidentally conveyed" by the speech, and that "passing" or "fleeting" references to an arguably public matter do not elevate the speech to a matter of "public concern" where the "focus" or "point" of the speech advances only a private interest. *See Rodgers*, 344 F.3d at 597-98; *Taylor*, 338 F.3d at 645-46; *Buckley*, 1999 WL 777542, at *4-5; *Dambrot*, 55 F.3d at 1187; *Rahn*, 31 F.3d at 412-13.

Turning to the employee's speech in the case at bar, viewed in context of the complete record, we believe that the primary

"focus,"[9] "point,"[10] or "communicative purpose"[11] of Appellant's letters was his own personal "beef"[12] with the union and the school district concerning his deteriorating job situation, and his references to collusion or corruption were "passing"[13] references that were "incidental to the message conveyed."[14] Thus his letters were not matters of "public concern."

Moreover, even if Appellant had satisfied this prong of the First Amendment retaliation analysis, we conclude that application of the *Pickering* balancing test still requires that the summary judgments entered by the court below be affirmed.

## PICKERING BALANCING TEST

Application of the *Pickering* balancing test is a matter of law for the court to decide. *Leary v. Daeschner,* 349 F.3d 888, 898 (6th Cir. 2000) (citation omitted).

In *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968), the Court held that the firing of a teacher for writing a letter to a newspaper, opposing a tax increase advocated by the defendant Board of Education, was a violation of the First

---

[9]*See Rodgers,* 344 F.3d at 599-600; *Buckley,* 1999 WL 777542, at *4; *Rahn*, 31 F.3d at 413.

[10]*See Rodgers,* 344 F.3d at 598-600; *Taylor*, 338 F.3d at 645; *Dambrot*, 55 F.3d at 1187.

[11]*See Dambrot*, 55 F.3d at 1188.

[12]*See Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988) (citation omitted), *cert. denied*, 488 U.S. 1007 (1989).

[13]*See Rahn*, 31 F.3d at 412-13.

[14]*See Rodgers*, 344 F.3d at 597; *Dambrot*, 55 F.3d at 1187.

---

Amendment because the issue was a matter of public concern. *Id.* at 570-71. The letter was personally critical of the members of the Board. The Supreme Court noted, however, that there were no close working relationships between the teacher and the members of the Board and, therefore, the protected expression did not violate the Board's "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568-70.

The Court further enunciated what has come to be known as the "*Pickering* balancing test": "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568.

Applying this test, we conclude that, even if portions of Appellant's expression did address matters of public concern, the disruptiveness of his speech in the workplace outweighed any value his expression might have had. Thus, summary judgment was properly granted.[15]

Authority for this conclusion is found in *Waters v. Churchill,* 511 U.S. 661 (1994). There, a nurse was reported to her employer as having made critical remarks concerning the operation of one of the departments of the hospital in which she was employed. She also made highly derogatory remarks concerning her supervisor, a physician. *Id.* at 665-66.

---

[15]We read the district court's succinct remarks at the summary judgment hearing as a statement that the summary judgments were granted on this ground.

Some of the remarks the nurse was alleged to have made were disputed by her. The Court held that her firing was justified, even though the employer had based its decision on the reported remarks without having determined what remarks were actually made. *Id.* at 677 (plurality opinion by O'Connor, J.), 686 (concurring opinion by Scalia, J.).

The Court recognized the right of even a governmental employer to deal with disruption in the workplace. It emphasized that the government as employer has efficiency concerns that give it greater discretion in dealing with a disruptive employee, more discretion than it would have to deter speech by a private citizen. *Id.* at 674-75. "[S]urely," the plurality observed, "a public employer may, consistently with the First Amendment, prohibit its employees from being rude to customers," as well as to other employees, including the supervising physician. *Id.* at 673 (internal quotations and citations omitted).

In language particularly applicable to the instant case, the plurality stated:

[T]he extra power the government has in this area comes from the nature of the government's mission as an employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the governor may . . . fire [a robustly critical high-ranking] deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

*The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.* The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Id.* at 674-675 (emphasis added).

The same principles have been recognized in our own opinions. *See, e.g., Leary v. Daeschner,* 349 F. 3d 888, 897 (6th Cir. 2000)*; Rodgers,* 344 F.3d at 596*; Hoover v. Radabaugh,* 307 F.3d 460, 466 (6th Cir. 2002)*; Strouss v. Mich. Dep't of Corrections,* 250 F.3d 336, 346 (6th Cir. 2001)*; Bonnell,* 241 F.3d at 810-811*; Charvat v. Eastern Ohio Reg'l Wastewater Auth.,* 246 F.3d 607, 617 (6th Cir. 2000)*; Chappel,* 131 F.2d at 573-574.

Thus, we find that Appellant's speech, even if of public concern, is not protected. Appellant's "speech" was highly disruptive to the point that it interfered with the effective operation of the school district's custodial staff. Indeed, at times they feared for their physical safety in the workplace due to Appellant's behavior. As the plurality stated in *Waters:* "As a matter of law, this potential disruptiveness was enough to outweigh whatever First Amendment value the speech might have had." *Waters,* 511 U.S. at 681. Therefore, on this ground also we find that the district court properly held that there was no First Amendment violation. Thus, the

lower court's grant of summary judgment on the retaliation claims must be affirmed.[16]

**DUE PROCESS**

The next issue presented is Appellant's claim that he was denied procedural due process because the school district did not meet the Constitutional due process requirements for pretermination and post-termination hearings. In support of these claims, Appellant states that he never received a hearing before a neutral decisionmaker. He further states that he was not permitted to present his grievance directly to the school board which, he asserts, is required by Michigan statute.

Due process requires some sort of pretermination hearing, the formality of which depends upon the importance of the interest and the nature of the subsequent proceedings. *See Duchesne v. Williams*, 849 F.2d 1004, 1006-07 (6th Cir. 1988), *cert. denied*, 489 U.S. 1081 (1989). For public employees who can only be fired for cause, the Supreme Court has held, specifically, that a pretermination proceeding is required. *Id.* (discussing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985)).

In *Loudermill*, the Supreme Court held that a full evidentiary hearing is not required prior to termination. Rather, the pretermination hearing is to provide an initial check against mistaken conclusions, "essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and

---

[16] Appellant's claims that his termination violated his First Amendment rights to association and to petition the government are without merit. Appellant's association claim must fail because he did not adduce any evidence that he was terminated because of his union activities. His petition claim fails because the "petition" he relied on in his complaint - - his contacts with the Troy City government - - was made after he was terminated, and thus could not have been a factor in the decision to terminate him.

support the proposed action." *Loudermill*, 470 U.S. at 545-46. The essential elements required for due process are notice and an opportunity to respond, either in writing or in person. *Id.* at 546.

In the Sixth Circuit, we have held that prior to termination of a public employee who has a property interest in his employment, the due process clause requires that the employee be given "oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer." *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir.) (citing *Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304 (6th Cir. 1988)), *cert. denied*, 498 U.S. 848 (1990). "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Loudermill*, 470 U.S. at 546.

We also have held that in the pretermination stage, the employee does not have a right to, and the Constitution does not require, a neutral and impartial decisionmaker. The "right of reply" before the official responsible for the discharge is sufficient. *Duchesne*, 849 F.2d at 1006. It is at the post-deprivation stage where a neutral decisionmaker is needed to adjudicate the evidence. Where there is a system of post-termination procedures available to the employee that includes a neutral decisionmaker and/or arbitration, coupled with a pretermination "right of reply" hearing, then the employee has received all the process due under the Constitution. *See Duchesne*, 819 F.2d at 1006; *Buckner*, 901 F.2d at 494; *Loudermill*, 470 U.S. at 545.

The law is well-established that it is the *opportunity* for a post-deprivation hearing before a neutral decisionmaker that is required for due process. As long as the procedural requirements are reasonable and give the employee notice and an opportunity to participate meaningfully, they are constitutionally adequate. *See Hennigh v. City of Shawnee*,

155 F.3d 1249, 1256 (10th Cir. 1998). As succinctly stated by the Seventh Circuit, the "availability of recourse to a constitutionally sufficient administrative procedure satisfies due process requirements if the complainant merely declines or fails to take advantage of the administrative procedure." *Dusanek v. Hannon*, 677 F. 2d 538, 542-43 (7th Cir.) (citations omitted), *cert. denied sub nom Dusanek v. O'Donnell*, 459 U.S. 1017 (1982). Consequently, where the employee refuses to participate or chooses not to participate in the post-termination proceedings, then the employee has waived his procedural due process claim. *See Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 904 (8th Cir. 2000) (citations omitted).

"The law is also clear that grievance procedures provided by a collective bargaining agreement can satisfy a plaintiff's entitlement to post-deprivation due process." *Hennigh*, 155 F.3d at 1256; *American Postal Workers Union Columbus Area Local AFL-CIO v. U.S. Postal Service*, 736 F. 2d 317, 319 (6th Cir. 1984). As we stated in *Buckner*, the opportunity to challenge the termination in a more detailed post-termination proceeding, under the collective bargaining agreement, satisfies the employee's constitutional due process rights. *Buckner*, 901 F.2d at 497.

In *Duchesne,* the employee claimed that he was denied procedural due process because his pretermination proceeding was biased. *Duchesne*, 849 F.2d at 1005. The proceeding was presided over by the person who ultimately fired the employee, who was also the person about whom the employee had complained to the city council. *Id.* We held that even if the decisionmaker at the pretermination hearing was biased, due process is fulfilled by a post-termination, trial-type proceeding where an opportunity to "ferret out bias, pretext, deception and corruption by the employer in discharging the employee" is provided. *Id.* at 1008. *Duchesne* held that the employee was not entitled to a pretermination hearing before a neutral decisionmaker, and

the injunction granted by the district court was vacated. *Id.* at 1007-1008.

In *Buckner*, a terminated police officer alleged that he had been denied due process because no hearing was held prior to his discharge. The officer further alleged that the termination violated a state statute because he was an alcoholic in treatment at the time of his discharge and believed he was fired because of that condition. *Buckner,* 901 F.2d at 493. We held that the facts of the case established that the officer was given notice and an opportunity to respond, even though he was in the hospital and there was not a formal pretermination hearing in the standard format. *Id.* at 495-496.

Similarly, in *Loudermill*, the Court held that "all the process that was due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures . . . ." *Loudermill*, 470 U.S. at 547-548.

In the case before us, we find that Appellant was given all the process due and that his constitutional rights were protected. Appellant was provided with two pretermination proceedings that were attended by himself as well as his chosen union representatives. Post-termination, he was given the opportunity for a full hearing before a neutral arbitrator, as provided for in the collective bargaining agreement. At the arbitration, the parties reached a tentative settlement. However, after a few days, Appellant rejected the settlement. Following this rejection, the union withdrew its representation of him. The record reflects that Appellant made no further attempts to pursue this issue directly with the school board. Instead, Appellant filed this lawsuit.

Under the authority cited above, due process has not been denied in this case. Appellant was given pretermination notice and an opportunity to be heard. That is all that is required prior to termination, even if the person against whom he made the allegations was the same person who presided

over the hearing. It is the post-termination proceeding where bias and corruption are ferreted out. *See Buckner,* 901 F.2d at 494; *Duchesne,* 849 F.2d at 1006.

We also find that post-deprivation due process was adequate. Appellant was provided a post-termination arbitration that he requested, attended, and at which he reached a settlement, albeit one he later rejected. The fact that Appellant was given the opportunity for a post-termination proceeding, before a neutral arbitrator, belies his claim that due process was denied. *See Buckner,* 901 F.2d at 494-5; *Hennigh*, 155 F.3d at 1256; *American Postal Workers,* 736 F.2d at 319. Being dissatisfied with the result of the arbitration does not give rise to a constitutional violation. Moreover, we find that Appellant waived his post-deprivation due process when, after rejecting the settlement, he failed to pursue further arbitral proceedings. *See Krentz,* 228 F.3d at 904.

Appellant's claim that Michigan law requires that he be given a hearing directly before the board, lest he be denied due process, also fails. The applicable Michigan statute, M.C.L.A. 423.211, states that an employee *may* negotiate directly with the employer and present grievances directly to the employer. By its plain language, this action is discretionary. Especially where other procedural measures are available for the employee to present his case, due process is not denied if the employer relies on the collective bargaining agreement to provide that process. *See Hennigh,* 155 F.3d at 1256; *American Postal Workers,* 736 F.2d at 319.

Therefore, as a matter of law, we find that the district court correctly held that Appellant was provided procedural due process. The employer provided not one, but two, pretermination hearings where Appellant was given notice and an opportunity to be heard. Moreover, he was provided the opportunity for a post-termination arbitration presided over by a neutral arbitrator. The Constitution requires nothing further.

Further, Appellant has failed to allege and prove the inadequacy of state remedies, which failure is fatal to his procedural due process claim. *See Jefferson v. Jefferson County Pub. Sch.*, 360 F.3d 583, 588 (6th Cir. 2004) (citing various cases). Indeed, he concedes that state law permitted him to arbitrate with the defendants even after the union declined to represent him. Nonetheless, Appellant failed to continue the arbitration after the union's withdrawal and elected to file this lawsuit instead.

## PRIOR RESTRAINT

The third issue Appellant presents for review is his allegation that the school district placed an unconstitutional prior or overbroad restraint on his speech when, as part of the 15-day suspension and investigation, he was instructed to refrain from speaking to other employees about the investigation. Appellant dedicates approximately one page of his argument to this issue, which is thin on analysis. Appellant simply alleges that there was no legitimate reason for this restriction, with no supporting evidence or argument.

The Sixth Circuit addressed the issue of a prior restraint on speech of a government employee in *Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir. 1999) *(abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). *Jackson* involved the termination of a police chief who alleged that his dismissal was racially motivated. He further alleged that a "gag order" not to speak to the media pending investigation of his alleged misconduct unconstitutionally restrained his speech. *Id.* at 746. We recognized that the *Pickering* balancing test applied to the analysis of such allegedly improper prior restraints on the speech of a public employee. *Id.*

Thus, the same process applies here as it did with the first issue we addressed in this appeal. That is, we first determine if the issue is one of private or public concern. Second, we balance the interests of the government employer in

maintaining a functioning and cohesive working environment against the employee's interest in speaking. *Id.*

We find that the balance of interests on this issue weighs in favor of the employer. As we stated previously, even if Appellant's speech had been of public concern, it is clear that the interests of the employer outweigh the interests of the employee, for this limited purpose. The school district only restricted Appellant's speech for 15 days, pending its investigation of allegations about him and by him. Further, he was restricted in his speech only as to co-employees. He was not restricted from speaking to the public or his union. As stated by Appellee Kelly in her deposition, the reason for this restriction was to prevent further disruption of the workplace and potential interruption of the investigation by Appellant's abusive and threatening behavior. The record is replete with Appellant's history of this very type of behavior.

Appellant has not presented any evidence of how he was limited by this alleged restraint. Thus, we have nothing to place on the *Pickering* scale to measure against the employer's interests. As such, we find that the alleged prior restraint on Appellant's speech was reasonable in light of the employer's interest in completing its investigation and in protecting the workplace. The district court properly granted summary judgment on this issue.

## CONSPIRACY

Appellant's final allegation is that Appellees are liable for civil conspiracy for unlawfully causing his termination. He bases this allegation on the theory that the "general objective which Hood and Kelly shared was to cause some type of adverse action concerning Farhat's career." Appellant claims that because Hood went to her supervisor to advise the supervisor of Appellant's conduct, there was a conspiracy.

A civil conspiracy is "an agreement between two or more persons to injure another by unlawful action." *Weberg v.*

*Franks*, 229 F.3d 514, 526 (6th Cir. 2000). Claims of conspiracy must be pled with some specificity: vague and conclusory allegations that are unsupported by material facts are not sufficient to state a §1983 claim. *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987) (citation omitted).

Quite simply, Appellant has failed to establish that he was injured by any unlawful action. As we have held here, there were no constitutional deprivations by Appellees, thus there is no unlawful action. Without an unlawful action causing injury, Appellant cannot prove the elements required to support a claim for conspiracy. Accordingly, the district court correctly granted summary judgment to Appellees on this issue.

## CONCLUSION

For the reasons set forth herein, we AFFIRM the judgment of the United States District Court for the Eastern District of Michigan, Southern Division, as to all claims.

*Appendix A*

Date:       5-11-00
To:         J. Jopke, Superintendent Troy Schools
From:       Ken Farhat, Custodial Steward, Troy Schools
Re:         Rebuttal to Letter dated 4-17-00

I have been off work since 2-25-00, because of the ever increasing violations of my civil rights, that has led to a suspension based on a false police report by an incompetent and corrupt union representative, Pam Hood. I was placed off work because I was exposing Pam Hood for her collusion and coercion, and failure to represent members of this bargaining unit, in cooperation with your administration. This situation is nothing more than a fabrication by administrators who are unwilling to be accountable for their abuse, discrimination, and incompetence.

Since you illegally removed me, I have been forced to attend illegal meetings with the purpose to create fabricated charges of inappropriate behavior, typical of the administrators in Troy Schools. I am supposed to be docile while I am harassed, lied about, in the most boring and redundant manner. If I show opposition to these lies, more lies are produced. The most telling ability of Kelly and her persecution of me, is the statement she made to the fact that I was filing charges against Pam Hood through proper channels of MEA. Kelly referred to me as a threat. Since she made mention to this in an angry and hostile manner, I assume I was disciplined for my legal actions within the union infrastructure. Kelly must believe I am a prisoner with no civil rights.

During a hearing on 4-14-00, I was asked how I felt about your letter dated 1-28-97, applied to me. It was a joke since it was illegal to begin with. You stated that day, when you gave me the letter, that it would not go in my file, it is not designated "personnel file," I was not offered a union representative and it is not noted that I was. I did not file a

grievance because you said at the time it was not a discipline action, but a concern. Furthermore, Maureen Kelly now says, in regard to that meeting that your letter pertains to, that I was pounding my fist on the table and leapt out of my chair, your letter does not describe this at all. Your letter is a joke, in the fact it isn't worth the paper it's written on. Also, Kelly is lying in claiming Harry Sahourieh and Lloyd Stage support her statements in regards to that day, and that they will provide testimony, testimony that you at the time did not pursue. Stage's exact quote was "I was not paying attention," seems odd if I had pounded my fist and leapt out of a chair that he didn't notice that, being one seat over. Harry flat out denies that he agrees with Kelly, or has provided any testimony in agreement. Now that I am aware of this letter being illegally put in my file, I will file the proper grievances.

The second so called discipline from Mike Williams, was grieved, but the grievances were not processed because Mary Watson refused to file them in the transition to the MEA, since I now know she is in collusion with the employer I will re-file these. Mike Williams's letter is an outrageous and cowardly tactic to camouflage his harassment, and abuse in claiming that I was committing medical fraud and illegal union organizing. When he could not prove this by entrapment, he lied and said he was threatened, typical of Williams. Also I wrote a rebuttal to all school board members and never really got a reply, so his letter is not worth the paper is [*sic*] written on. And again, Harry was present and ready to testify that there was no threat. So much for those.

In regards to Pam Hood, the Troy Police don't believe her, and closed the case. She concealed the fact that she was coerced by Mike Williams prior to calling the police, that she has been plotting this for some time, and has been slandering me in the work place for years. As a matter of fact, I made a complaint to Carol Miller, Asst. Principle [*sic*] at Troy High, some weeks earlier in regards to Hood's attacks on me. It was the same day I asked that something be done with Becky

Makowski, another employee that you have allowed to attack me in the work place, along with Butler-Bull and Loretta Witkowski. Hood's actions were of retaliation and defense because she realized I was going to expose her, and file charges for collusion, and I would not submit to collusion myself in regards to a member I was representing. A situation that Pam Hood states, "I'm doing what Maureen Kelly wants me to do, I'm doing what I'm told to do."

My pattern of behavior is of honesty and integrity, traits that are solely missing in Troy Schools. It is your administration that is feared not me. My characterization of those such as Jack Britton is completely warranted, he is an incompetent supervisor that retaliated against me by abuse of his authority, sanctioned by you. When I exposed his abuse and threatening behavior towards members of this bargaining unit, I was illegally demoted and further slandered and libeled. You also claim my co-workers fear me, if they fear me it is because of the conspiracy of this administration and corrupt union reps that have been allowed to spread this slander and libel of threats against people. Furthermore, as always in Kelly's warped investigations, she never names who these frightened co-workers are, or of their testimony, and has refused to provide this testimony.

I will only admit I talk fast and loud, everybody knows this as a natural trait. Even if it is a flawed character trait, it is not a threat. This is being exploited by this administration to avoid the grievances I have filed, and will file upon returning to work.

I expect this administration to produce more than rhetoric as evidence.

I also request that a copy of the medical report be sent to my residence, this is in regards to the appointment with Dr. Sheiner. Contact Maureen Kelly.

Lastly, I have made an appointment to attend counseling at the Evergreen Counseling Center, although this may change, because of PPOM requirements. Not because of my behavior, but because of this administration's behavior.

Sincerely,

Kenneth Farhat

Cc. J. Cusmano
    M. Kelly
    M. Williams
    L. Boehmns
    J. Britton

*Appendix B*

Date:      5-18-00
To:        Lu Battaglieri, President MEA
From:    Ken Farhat, Custodial Rep Troy Schools, TESPA
Re:       Failure to represent

On 5-16-00, I met with Tom Fette, Joe Cusmano, and Jeff Nyquist, you know who they are. Also present was Tim Hagan, my attorney. During this meeting and by Mr. Nyquist's direction it was agreed that an investigation, into the allegations and incidents leading up to my suspension, would be conducted. Apparently Mr. Nyquist has no influence over Cusmano, or Fette, to motivate them to follow up on this. I believe Mr. Nyquist to be in good faith at this time, Fette and Cusmano are not. Instead they continue to avoid their responsibility, to cover up for Pam Hood, and protect the employer, this corrupt local, and the incompetence of the MEA reps up to date.

Today at approximately 9:30 a.m., I called Cusmano about a concern more recent that the May 16 meeting. He refuses to investigate. It only involves the President of my local, Pam Hood, claiming that I stopped her bus with students aboard. I believe that offence would get me life in prison, if true. It is a demented accusation from a demented and sick human being. Cusmano refused to contact Hood, and stated it was not his concern.

Furthermore, in regards to the other matters of a needed investigation, he now flatly refuses to do anything to uncover evidence. Evidence and testimony that will prove beyond a shadow of a doubt of the conspiracy behind Hood's behavior, and my being victimized for being the only honest union rep in Troy with the ability and courage to stand up to this ignorant and abusive administration in Troy Schools.

I can only conclude Cusmano, Fette, Mott, and Gay Shaw are intentionally creating obstacles, innuendo and lies, to cover up for the corrupt contract negotiation, the ongoing collusion of the local representatives, and the preferential treatment they receive. Of course at the expense of the bargaining unit. An expense that has led to privatization, loss of seniority rights, loss of bidding rights, unwarranted discipline, loss of medical benefits, loss of sick days, the implementation of a medical exam article that violates our civil rights, and a hostile environment of dissension and chaos. Least I am remiss, I should include the main component here, Maureen Kelly's good friend Mary Watson. A MEA staff rep who has no problem lying in front of nearly 200 people about all the above. This to enhance her mentally ill friend Kelly, and to use this bargaining unit as a concession for the teachers negotiation.

On 5-17-00, my attorney was contacted by Mr. Nyquist. He stated a representative would be assigned to conduct an investigation into my situation. On 5-18-00, I contacted Fette, he claimed no knowledge of a rep other then an advocate in a distant arbitration. I need action now. I don't know what Cusmano intends to present at this arbitration other than begging like a dog. I will not do this.

The MEA has committed total failure in this matter and others of this bargaining unit, yet Mark Middlewood is being allowed to parade around the state claiming this contract is a good contract. It is, if you're a mindless animal, which Maureen Kelly has done a good job in hiring mindless, criminals as employees.
Well now you've been told, somewhat that is. I invite you to a union meeting to hear our discussion. Oh excuse me that's right we don't have meetings anymore. They are canceled when our local reps are exposed for their incompetence and collusion, and refuse to answer questions of their conduct. Like our last meeting last February.

I have been disciplined because I choose to expose MEA and local reps in complete collusion with the employer. To the

point these liars are giving testimony, illegal testimony, to the employer. Despicable.

It is your responsibility to assign staff that is honest and unbiased. Where is the aggressive representation that was promised during the organizing effort? Where is the legal team that was supposed to protect our civil rights? You have no answer because it was all a lie, and you were not President. This was orchestrated by Mary Watson and carried on by every MEA rep since. Fix it please. Believe me, I will contact newspapers and politicians till something is done. I will not be deterred, by any threat or conspiracy. I intend to sue.

Sincerely,

Ken Farhat

CC.   Fette
      Shaw
      Hood