Chaplain William AKRIDGE, Plaintiff,

v.

Reginald A. WILKINSON,
et al., Defendants.

No. 2:03–cv–434.

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 22, 2004.

Jeffrey A. Shafer, David R. Langdon, Langdon & Shafer LLC, Cincinnati, OH, for Plaintiff.

Jim Petro, Ohio Attorney General, Jack Wilson Decker, Timothy A. Lecklider, Assistant Attorney General, Employment Law Section, Columbus, OH, for Defendants.

*OPINION AND ORDER*

GRAHAM, District Judge.

This is an action filed pursuant to 42 U.S.C. § 1983 by plaintiff William Akridge, a chaplain employed by the Ohio Department of Rehabilitation and Correction ("ODRC"), against Reginald A. Wilkinson, the director of the ODRC, Alan J. Lazaroff, warden of the Madison Correctional Institution ("MCI"), and Bobby J. Bogan, Jr., the deputy warden of special services at MCI. Defendant Wilkinson is named as a defendant in his official capacity only, and defendants Lazaroff and Bogan are named as defendants in their official and individual capacities. Plaintiff alleges that defendants Lazaroff and Bogan retaliated against him for exercising his First Amendment right to freedom of speech when plaintiff was fined two days pay for refusing to allow a gay inmate to participate as a leader of the praise band or choir in the Protestant services at MCI. Plaintiff also alleges that the disciplinary sanction was imposed in violation of due process of law because the MCI regulations on discrimination due to sexual orientation are unconstitutionally vague. Plaintiff seeks money damages and declaratory and injunctive relief.

This matter is before the court on the parties' cross-motions for summary judgment.

*I. Summary Judgment Standards*

The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby*, *Celotex* and *Matsushita* effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. 2505). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judg-

ment motion. *Id.* It is not sufficient for the nonmoving party to merely " 'show that there is some metaphysical doubt as to the material facts.' " *Id.* (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## II. History of the Case

Plaintiff, an ordained minister of the American Baptist Churches, began his employment at MCI on April 29, 2002, as a full-time Protestant minister. His immediate supervisor was Deputy Warden Bogan, who in turn reported to Warden Lazaroff. At MCI, plaintiff was assigned to provide religious services to Zone A inmates, comprised of a large percentage of sexual offenders. According to plaintiff, an inmate choir previously participated in the Protestant services, but the choir had been disbanded some months prior to his arrival at MCI, reportedly due to infighting, and plaintiff did not re-institute the choir. However, an inmate praise band led by inmate Hatfield participated in the services.

At some point in October, 2002, inmate Hatfield complained to plaintiff that another band led by inmate Michael Reed had taken the musical instruments, and this other band was planning on playing at the service. Plaintiff told Reed that he was not opposed to a new band playing at the

service, but that, for all he knew, they intended to play "pagan music" and they needed to talk to plaintiff first. Ackridge Dep., pp. 19–20. At that time, plaintiff did not know that Reed was gay. Inmate Reed confronted plaintiff on the way back to plaintiff's office, and stated that plaintiff was discriminating against him because "I'm gay." They engaged in a heated discussion, during which plaintiff told Reed, "I didn't know you were gay. But since you tell me you are gay, then that is reason enough for you not to lead the band." Ackridge Dep., pp. 24–25. Plaintiff and Reed then engaged in a discussion in plaintiff's office.[1] Plaintiff concluded from Reed's use of the present tense that he was both sexually active and unrepentant.

On or about October 24, 2002, Reed gave Bogan a form entitled "Informal Complaint Resolution." On this form, he complained because plaintiff denied his gospel band permission to play during the worship services. Reed further stated,

> We have been the house gospel band for at least 5 years. All of this came about because inmates labeled me a homosexual to the chaplain and don't like the idea of a homosexual directing the choir. . . . The church is ran and led in a conservative dogma that promotes ostersizing [sic] gays from church choirs and bands. . . . I am being singled out and I wish the discrimination to stop. I should be allowed to direct the choir and sing in our gospel band.

Ackridge Dep., Ex. 3.[2]

On October 31, 2002, plaintiff had a telephone conversation with Bogan, during

---

1. Plaintiff has not revealed the contents of this discussion, maintaining that the conversation is subject to the clergy-communicant privilege.

2. As noted previously, plaintiff's initial decision involved not letting Reed participate in

the services as part of a praise band. At the time of Reed's complaint, there was no choir, but Reed had participated in the choir in the past. It is clear from Reed's complaint that he wished to participate in the services by directing the choir and/or by singing in the

which Bogan informed plaintiff about Reed's complaint. Plaintiff told Bogan that he was banning Reed from leading the choir because he was a practicing homosexual. Ackridge Dep., p. 50. Plaintiff also prepared a written response to Reed's complaint, in a memorandum to Reed dated November 4, 2002. Ackridge Dep., Ex. 8. Plaintiff referred to the fact that the choir had been disbanded. He noted that while he was not opposed to a new band playing at the services, he wanted to meet the band members first and determine what they intended to play. Plaintiff further stated, "In your statement, you imply that I am discriminating against you because you are gay. This involves a discussion/counseling session in my office after the incident discussed above." Plaintiff then declined to address the concerns raised in Reed's complaint, noting the privileged nature of that discussion.

By memorandum dated October 31, 2002, plaintiff gave Bogan notice of his intent to transfer to another institution. Ackridge Dep., Ex. 12. Plaintiff referred to his conversation with Bogan on that date, stating, "I told you that I was not going to condone something the Bible was against." Plaintiff indicated that he felt that he should look for another job because he felt very strongly about this issue. He further stated, "My position is this: I do not think the inmates should be running the Protestant worship service. I do not think the homosexuals should be running the worship service." Plaintiff also noted, "It is apparent to me that we have a different philosophy on the role of the chaplain; . . . and homosexuals leading the Protestant worship service." Ex. 12.

On November 5, 2002, Bogan conducted an investigatory interview with plaintiff and a union representative in regard to Reed's complaint. *See* Ackridge Dep., Ex. 1. Bogan concluded, independent of any consideration of Reed's sexual orientation, that there was no justification for excluding Reed as a choir director because Reed had been a choir director prior to plaintiff's arrival. Bogan Dep., pp. 26, 32. Prior to the conclusion of the interview, plaintiff informed Bogan that permitting homosexuals to participate in the services in a leadership role was against plaintiff's religious beliefs. Bogan Dep., pp. 37, 41–42. Bogan felt that Reed should not be denied the opportunity to serve in any capacity with the choir because he was homosexual. Bogan Dep., pp. 44. 48. As plaintiff's supervisor, he had the authority to make the final decision regarding Reed's participation in the choir. Bogan Dep., p. 49. At the conclusion of the interview, Bogan gave plaintiff a direct order to reinstate Reed as one of the choir directors. Plaintiff refused to obey the order, stating, "The Scripture speaks of homosexuality as wrong, in the Old and New Testament, and I will not adhere to your direct order." Ex. 1. Plaintiff acknowledges that he refused to follow Bogan's order. Ackridge Dep., p. 71. Bogan did not make the decision to discipline plaintiff. He referred the matter to Lazaroff to decide whether disciplinary proceedings under the applicable collective bargaining agreement were warranted.

On November 12, 2002, Warden Lazaroff issued a notice of pre-disciplinary conference to be conducted before Labor Relations Officer John Row on November 19, 2002. The charge was insubordination for failure to carry out Bogan's direct order. A hearing was held on November 19, 2002. After the hearing, plaintiff submitted a memorandum to Row dated November 22, 2002, which contained additional argu-

praise band. As a result, both the terms "band" and "choir" are used by the parties in later documents referring to Reed's participation in the Protestant services.

ments. Ackridge Dep., Exs. 10 and 11. The arguments made by plaintiff in this document include: (1) since most protestant inmates believe that homosexuality is wrong, mandating that a homosexual inmate serve as choir director would be interfering with the free exercise rights of those inmates; (2) giving a homosexual a leadership position would amount to the chaplain encouraging other inmates to violate the prison rule against sexual conduct; (3) giving a homosexual a leadership position would award a person who is unworthy to fill such a position; (4) the religious needs of homosexual inmates would best be served by a homosexual church; (5) plaintiff as chaplain was the person with authority under the prison rules to determine how to conduct religious services, and Bogan's order resulted in Bogan and Reed usurping this authority. Ex. 10.

On December 4, 2002, Lazaroff presented plaintiff with a notice formally fining him two days pay in the amount of $329.92 for insubordination due to plaintiff's refusal to obey the direct order given by Bogan. Lazaroff concluded that the order given to plaintiff was a valid order. Lazaroff Dep., p. 16. He further concluded that plaintiff had excluded Reed as a leader of the choir due to Reed's homosexuality, and that this was impermissible discrimination based on sexual orientation. Lazaroff Dep., pp. 17, 29, 39. Lazaroff believed that MCI had a policy of nondiscrimination on the basis of sexual orientation. Lazaroff Dep., pp. 43–44. He also believed that it was

> poor corrections, poor penology to separate out groups, create tensions among the population, state that you have no ability to be in here because you're white or black or you're gay or you're straight or you're tall or you're short, those kinds of things. And that became the background for this decision, balancing out what he had to say about that versus our nondiscrimination against in-

mates to be involved in programming and be involved in various functions and various positions.

Lazaroff Dep., p. 60. Lazaroff further noted that while prison regulations prohibited sexual behavior, those regulations do not support the removal of an inmate from a program assignment based solely on sexual orientation. Lazaroff Dep., p. 74. Lazaroff also stated that, with the exception of this one incident of insubordination, plaintiff's work performance was excellent, and that he bore no ill will toward plaintiff. Lazaroff Dep., p. 80. Plaintiff never complied with Bogan's order. However, the issue of plaintiff's noncompliance was not pressed beyond the fine because Lazaroff was aware that plaintiff would be transferring to another institution in the near future, and he did not wish to pursue more serious levels of discipline. Lazaroff Dep., pp. 79–80.

Following the December 4, 2002, disciplinary conference, plaintiff submitted a memorandum setting forth justifications for his position. Ackridge Dep., Ex. 15. Plaintiff noted that Reed had been found guilty in 1994 of violating prison rules prohibiting sexual conduct by engaging in a homosexual act. He adhered to his prior position that he would not go against his conscience.

The record also includes a letter dated January 30, 2003, from Terry Collins, Deputy Director of Institutions, to plaintiff. Ackridge Dep., Ex. 7. The letter advised plaintiff of his right to appeal the disciplinary decision. Collins also indicated his agreement with Lazaroff's decision. He referred to the ODRC policy against discrimination based on sexual orientation, and stated that, absent overt sexual acting out, an inmate should not be removed from a job or program based solely on sexual orientation. Ex. 7.

Plaintiff did not pursue an appeal from the disciplinary action. Plaintiff transferred to another institution shortly after the disciplinary action.

### III. First Amendment Claim

#### A. Elements of Claim

Plaintiff asserts a claim of First Amendment retaliation.[3] Defendants argue that plaintiff has failed to produce evidence sufficient to survive a motion for summary judgment on that claim. Defendants Lazaroff and Bogan also assert that even if plaintiff has satisfied the prima facie elements of his retaliation claim, they are entitled to summary judgment in their individual capacities on the grounds of qualified immunity.

 In order to establish a prima facie case of First Amendment retaliation, plaintiff must demonstrate: (1) he was engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a "substantial" or "motivating factor" in the adverse action. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir.2003). The framework for this analysis was summarized in *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir.2003), as follows:

> While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, *Rankin v. McPherson*, 483 U.S. 378,

383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)(citing *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)), a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions. *See United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 475 n. 21, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). Therefore, in determining whether a public employer has violated the First Amendment by firing a public employee for engaging in speech, the Supreme Court has instructed courts to engage in a three-step inquiry. First, a court must ascertain whether the relevant speech addressed a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If the answer is yes, then the court must balance the interests of the public employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee. *Mt. Healthy City Sch. Dist. Bd. of*

---

**3.** Plaintiff's complaint also contained a section entitled "EXPRESSIVE ASSOCIATION," in which he alleged that the defendants' order to place a gay inmate in a leadership position in the choir infringed on his right not to be associated with a message of acceptance of homosexuality with which he did not agree. However, in his memorandum contra defendants' motion for summary judgment, plaintiff denies that he is asserting a First Amendment association claim like that advocated in *Boy Scouts of America v. Dale*, 530 U.S. 640,

120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) and *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). Memorandum Contra, p. 7. Instead, he relies on those cases for the proposition that his refusal to comply with the order constituted speech under the First Amendment, and that defendants' order infringed on that speech, as "background" for his "public speech [retaliation] claim." *Id.*

*Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Perry [v. McGinnis*, 209 F.3d 597, 604 (6th Cir.2000)].

 The first element concerns whether the employee spoke as an employee for personal interest or as a citizen on a matter of public concern. Speech involves matters of public concern when it involves a "matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. Matters of public concern are to be contrasted with internal personnel disputes or complaints about an employer's performance. *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir.2001). As the Supreme Court stated in *Connick*:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 147, 103 S.Ct. 1684.

 Whether the speech at issue involves a matter of public concern is a question of law for the court. *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir.2004); *Bonnell v. Lorenzo*, 241 F.3d 800, 809–10 (6th Cir.2001). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684.

 The fact that the public employee engages in the speech while in the course of his employment does not preclude a finding that the speech touches upon a matter of public concern. *Rodgers*, 344

F.3d at 598–99. The fact that the speech was only communicated to the employer and not the public does not preclude the speech from being related to a matter of public concern. *Charvat v. Eastern Ohio Regional Wastewater Auth.*, 246 F.3d 607, 617 (6th Cir.2001). The entire speech does not have to address matters of public concern, so long as some portion of the speech does so. *Connick*, 461 U.S. at 149, 103 S.Ct. 1684.

 However, the court must determine the "focus" of the speech; the "point of the speech in question" "to what purpose the employee spoke;" "the intent of the speech;" or "the communicative purpose of the speaker." *Farhat*, 370 F.3d at 592 (citations omitted). A matter does not become one of public concern simply because, in other circumstances, its subject matter might be of public interest. *Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684; *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 966 (6th Cir.2002). Passing or fleeting references to an arguably public matter do not elevate the speech to a matter of public concern where the focus or point of the speech advances only a private interest. *Farhat*, 370 F.3d at 592. Likewise, "[c]ontroversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection." *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1187 (6th Cir. 1995). The employee's motive for engaging in the speech in question is a relevant, but not dispositive, factor when considering whether an employee's expression is of public concern. *Rodgers*, 344 F.3d at 600.

 Even if speech addresses a matter of public concern, an adverse job action may be justified when "legitimate countervailing government interests are sufficiently strong." *Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 675, 116 S.Ct. 2342,

135 L.Ed.2d 843 (1996). The employee's interest must be balanced with the government's interest as an employer in maintaining an effective and efficient organization. *Connick,* 461 U.S. at 151–52, 103 S.Ct. 1684. The application of this balancing test is a matter of law for the court to decide. *Farhat,* 370 F.3d at 593; *Leary,* 349 F.3d at 898.

The Supreme Court has recognized that the government as employer has efficiency concerns that give it greater discretion in dealing with a disruptive employee than it would have to deter speech by a private citizen. *Waters v. Churchill,* 511 U.S. 661, 674–75, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Employers are not required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick,* 461 U.S. at 152, 103 S.Ct. 1684. Further, "[w]hen employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." *Id.* at 153, 103 S.Ct. 1684. *See also Perry v. McGinnis,* 209 F.3d 597, 607 (6th Cir.2000)(maintaining employee accountability is a legitimate organizational interest).

■■■ Factors to be considered in balancing the employee's and employer's respective interests include whether an employee's comments: (1) meaningfully interfered with the performance of his duties; (2) undermined a legitimate goal or mission of the employer; (3) created disharmony among co-workers; (4) impaired discipline by superiors; or (5) destroyed the relationship of loyalty and trust required of confidential employees. *Rodgers,* 344 F.3d at 601. The state bears the

burden of showing a legitimate justification for discipline. *Brandenburg,* 253 F.3d at 899.

■■■ The second element requires plaintiff to show that the adverse action caused plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity. *Cockrel v. Shelby County School Dist.,* 270 F.3d 1036, 1055 (6th Cir.2001).

■■■ The third element requires plaintiff to show that defendants' decision to discipline him was motivated, at least in part, by the exercise of his free speech rights. The plaintiff may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent, but rather, the employee must link the speech in question to the employer's decision to discipline him. *Id.*

■■■ If plaintiff succeeds in establishing the elements of a prima facie case, the burden of persuasion then shifts to the defendants. The defendants must show by a preponderance of the evidence that they would have taken the adverse job action even if plaintiff had not engaged in constitutionally protected activity. *Id.* at 1056.

### B. Plaintiff's Claim

#### 1. Matters of Public Concern

■■■ Several statements were made by plaintiff in this case. Initially, plaintiff made the statement to Bogan that he would not permit plaintiff to participate in a leadership role in the Protestant services because homosexuality was condemned in the Bible. Plaintiff further contends that his refusal to obey Bogan's order constituted a demonstrative form of expression protected under the First Amendment, in that his refusal was basically a reiteration or reinforcement of his previously announced

position on homosexuals having a leadership role in the services. Plaintiff also made additional statements in response to the disciplinary charge leveled against him.

Plaintiff argues that his initial statements concerning his decision not to allow Reed to have a leadership role in the services address a matter of public concern because the topic of homosexuality is currently a matter of social importance. However, plaintiff was not commenting on the social or legal ramifications of homosexuality in general. His statements occurred in the limited context of a decision he made within the scope of his employment as chaplain. Plaintiff's personal opinions on whether the Protestant faith condemns homosexuality as a sin, regardless of their validity, do not constitute matters of public concern. Plaintiff's views on whether permitting Reed, a homosexual, to participate in the prison services in a leadership capacity would be sending a message to other inmates of tolerance or acceptance of homosexuality incompatible with the Protestant faith and plaintiff's own beliefs do not involve matters of public concern. The "point" or "focus" of the statements was simply to explain and defend to his superiors his decision not to permit Reed to participate as a choir leader or band member in the services, and to establish the bounds of his authority as chaplain. Plaintiff's statements concerning his views on Reed's participation in the services in a leadership role and his refusal to permit Reed's participation were made to further a private purpose, that being plaintiff's own agenda as to how the services at MCI should be conducted.

Plaintiff's refusal to obey Bogan's order was likewise not a comment by plaintiff as a citizen, but rather a comment made in his role as chaplain. In refusing to follow Bogan's order, plaintiff was defending his authority as chaplain and arguing that his decision on a matter within the scope of his employment should predominate over the policy decisions of his supervisor on that same matter. These are internal employment matters, not a subject of public concern. *See Buazard v. Meridith,* 172 F.3d 546, 548–49 (8th Cir.1999)(act of plaintiff in refusing to follow orders were taken in his role as an employee, not as a concerned citizen).

Plaintiff also made several statements in defense to the disciplinary charge. *See* Ackridge Dep., Ex. 10. Plaintiff made statements concerning his authority as chaplain under ODRC Rule 72–REG–01 to determine how the Protestant services would be conducted. He disputed Bogan's authority to reverse his decision, claiming that Bogan and Reed were usurping his authority to conduct the services. However, the disagreement concerning the scope of plaintiff's authority as chaplain and whether his decision to exclude Reed fell within the scope of that authority concern a personnel matter within the institution, not a matter of public concern. Plaintiff's statements that giving Reed a leadership position would be rewarding a person unworthy to fill that position, and that the needs of homosexual inmates would be best served by a homosexual church are no more than expressions of plaintiff's own personal opinions on the immorality of homosexuality, made as part of his defense to the disciplinary charge. In this context, they do not constitute comments on matters of public interest. Plaintiff also stated that giving Reed a leadership position would interfere with the free exercise rights of other inmates, and would encourage inmates to break the prison rule against engaging in sexual activity. The denial of inmates' free exercise rights and prison security might constitute matters of public concern in some cases. However, in

this case, these matters were only tangentially addressed by plaintiff as part of his defense to the disciplinary charge. The focus of these comments was to offer further justification for his decision, a personnel matter.

### 2. Balancing of Interests

■ Even assuming that plaintiff's statements regarding the immorality of homosexuality, the free exercise rights of inmates, and the potential of encouraging inmates to violate prison rules against sexual behavior address matters of public concern, plaintiff's right to make those statements must be balanced against the interests of the ODRC, plaintiff's employer. Defendants argue that the balance weighs in their favor in this case.

Defendants produced evidence that MCI had a policy of nondiscrimination based on sexual orientation. They note ODRC Policy 32–EEO–01, Ackridge Dep., Ex. 17, which prohibits discrimination against employees based on sexual orientation. They also cite the disciplinary grid from ODRC's "Standards of Employee Conduct" which includes acts of discrimination or harassment on the basis of sexual orientation as improper conduct. Ackridge Ex. 5. Lazaroff also believed that the policy of nondiscrimination against inmates was also recorded in other writings, although no other document has been produced. Lazaroff Dep. pp. 43–44.

■ However, even assuming that no written ODRC policy concerning discrimination against inmates based on sexual orientation exists, that does not mean that the defendants should not have been concerned about the possible ramifications of such discrimination. Excluding an inmate from participation in a prison program due to his sexual orientation has possible constitutional implications beyond any prison regulation prohibiting such discrimination. It is well established that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). "Where an inmate's religious freedom is at stake, correctional officials may only adopt regulations which are 'reasonably and substantially' justified by official concern for internal security and inmate discipline." *Brown v. Johnson*, 743 F.2d 408, 411 (6th Cir.1984). The rule of affording reasonable opportunities of religious exercise to prisoners extends to the religious practices of homosexuals. *See Brown*, 743 F.2d at 411 ("Governmental interference with a prisoner's religious practices cannot be justified merely because a particular faith is sympathetic to the religious needs of homosexuals."). Thus, in *Phelps v. Dunn*, 965 F.2d 93 (6th Cir.1992), the Sixth Circuit found that an inmate who alleged that a chaplain denied the inmate the right to participate in religious services due to the inmate's homosexuality stated a claim under § 1983, and reversed the district court's grant of summary judgment in favor of the inmate.[4]

In this case, Bogan and Lazaroff felt that precluding Reed from taking a leadership role in the services based on his sexu-

---

4. Plaintiff cites *Phelps* for the proposition that attendance at religious services, as opposed to filling a leadership role, is sufficient to satisfy an inmate's First Amendment rights. *Phelps* did not so hold. The inmate in *Phelps* argued that he was denied both the right to attend services and a leadership role. 965 F.2d at 99. The court found that although a genuine issue of fact had been presented as to whether the inmate was denied attendance rights, the record contained no evidence of the denial of more active participation, and thus the denial of a leadership role was not an issue in the case. *Id.* at 100–01.

al orientation was discriminatory. Bogan testified that, in his opinion, if plaintiff's decision had been upheld and if Reed had appealed his grievance to the Chief Inspector's Office, the institution would not have prevailed in such an appeal. Bogan Dep., p. 43. Further, Lazaroff concluded that it was bad penology to exclude an inmate from a program simply because of a characteristic such as sexual orientation, thereby creating tensions among the prison population. Lazaroff Dep., p. 60.

Plaintiff argues that Reed's exclusion was valid based on his previous violation of the prison rule against sexual behavior. Plaintiff's position during his disciplinary proceedings appeared to be that since Reed acknowledged that he was currently a homosexual, this was sufficient to indicate that he was currently a practicing homosexual. There is evidence that in 1994, Reed was found to have violated Ohio Admin. Code § 5120–9–06, which prohibits "(11) Consensual physical contact for the purpose of sexually arousing or gratifying either person" and "(29) Seductive or obscene acts, including indecent exposure or masturbation." However, this occurred eight years prior to the incident at issue in this case. There is no evidence whatsoever that Reed was engaging in sexual conduct of any kind at the time of plaintiff's decision to exclude him from a leadership role. The prison rules do not prohibit mere homosexual orientation or sexual orientation of any kind. While prison security concerns may furnish a basis for limiting an inmate's religious exercise, *see Brown,* 743 F.2d at 412–13, no evidence has been presented in this case that inmate Reed posed any kind of security threat which would warrant barring his participation as a choir leader or band member.

Plaintiff also contended during his disciplinary proceedings that placing Reed in a leadership role would violate the free exercise rights of other inmates who believe that homosexuality is morally wrong. However, there is no evidence in this case that any such inmates exist. Plaintiff described conversations with other inmates concerning Reed or homosexuality. However, this evidence is hearsay and may not be considered in summary judgment proceedings. *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir.1997); *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996). Bogan testified that in issuing his order to plaintiff, he gave some consideration to the faith requirements of the religion. Bogan Dep., p. 36. However, there is no evidence that Reed intended to promote or defend homosexuality as part of his participation in the choir or band. There is no evidence that Reed's participation as a leader of the choir or as a band participant would interfere with the free exercise rights of other inmates. The defendants were faced, however, with Reed's complaint that *he* was being denied his free exercise rights. Faced with the task of balancing free exercise rights, defendants did not act unreasonably in discounting plaintiff's arguments and giving more weight to Reed's complaint.

The defendants also had an interest in enforcing discipline among employees. As noted previously, maintaining employee accountability is a legitimate organizational interest. *Perry,* 209 F.3d at 607. As the Supreme Court noted in *Waters,* 511 U.S. at 672, 114 S.Ct. 1878, "though a private person is perfectly free to uninhibitedly and robustly criticize a state governor's legislative program, we have never suggested that the Constitution bars the governor from firing a high-ranking deputy for doing the same thing." In *Moran v. State of Washington,* 147 F.3d 839, 850 (9th Cir.1998), the court noted that the law did not require a state agency to sit by as an employee refused to implement an

agency program, stating, "The First Amendment simply does *not* constitutionalize insubordination."

Plaintiff argues that his refusal to obey the order to permit Reed to act as a choir director was not disruptive. He claims that his statement did not meaningfully interfere with the performance of his duties, create disharmony among co-workers or destroy any relationship of loyalty and trust required of confidential employees. He is correct that there is no evidence that any of these factors are applicable here.

Plaintiff also argues that his actions did not undermine any legitimate goal or mission of the ODRC Plaintiff contends that defendant has no interest in whether there is a gay inmate choir leader. He further contends that ODRC had no policy of anti-discrimination. However, there is evidence that ODRC did have a policy of nondiscrimination against inmates based on sexual orientation, regardless of whether that policy was written down. In addition, there are constitutional prohibitions against such discrimination. Inmate Reed had filed an administrative complaint alleging such discrimination. Bogan felt that if he upheld plaintiff's decision and Reed decided to appeal the matter further, Reed would prevail. In addition, as *Phelps* indicates, Reed could have filed a § 1983 action against ODRC based on plaintiff's alleged discriminatory motive.

As noted above, the employer is not required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152, 103 S.Ct. 1684. Defendants were justifiably concerned about the potential impact of plaintiff's decision both on the ODRC's policy against discrimination and on the institution's corrections policies of not dividing or excluding inmates due to an inmate's particular attributes or characteristics.

Plaintiff further argues that his actions did not impair discipline by his superiors. He claims that Bogan created a disciplinary situation where none existed. This ignores the fact that plaintiff admittedly disobeyed a direct order by his supervisor. There is no evidence that Bogan or Lazaroff manufactured or colluded in the complaint filed by Reed which triggered Bogan's inquiry and the later disciplinary proceedings. The fact that the defendants decided not to pursue plaintiff's continued insubordination any further was due to the fact that plaintiff transferred to another institution soon thereafter. This does not diminish the threat which plaintiff's actions posed to the ordered administration of the institution and its policies.

Weighing the defendants' interests against the plaintiff's First Amendment rights, the court finds that the balance tips in favor of the defendants on the *Pickering* scale.

*3. Adverse Action*

■ The second element of the retaliation claim requires plaintiff to show that the adverse action caused plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity. Defendants argue that plaintiff was only fined two days pay, that the record of the fine had been or was due to be expunged from his employment records, that plaintiff is no longer working at MCI, and that plaintiff is scheduled to retire soon. However, plaintiff was given a monetary fine, and he has stated that he has not spoken against homosexuality at his current job assignment with the ODRC for fear of incurring additional discipline. Plaintiff has produced sufficient evidence to satisfy this element.

#### 4. Causation

The third element of the retaliation claim requires plaintiff to produce sufficient evidence that his speech was a substantial or motivating factor for the adverse job action. There is no evidence that the defendants disagreed or had any problem with plaintiff's statements concerning homosexuality being against the teachings of the Bible or the Protestant religion. They did disagree with plaintiff's refusal to permit Reed to participate in the services as a choir director. Defendants decided, for their own policy reasons, that Reed could not be precluded because of his sexual orientation from occupying a leadership role in the choir. Plaintiff refused to obey a direct order to permit Reed to participate in that role, and it is this act of subordination, not the reasons for plaintiff's refusal, that resulted in the imposition of discipline.

Plaintiff views his act of refusing to follow the order and the reasons for his refusal as being inseparable. He also seeks to characterize his refusal to follow the order as a demonstrative statement under the First Amendment, hoping that this will establish the element of causation. However, even assuming that plaintiff's refusal to follow the order and his reasons for that refusal cannot be separated under the First Amendment, this court has already determined that ODRC's interests in furthering MCI's institutional policies and ensuring compliance by employees with the orders of superior officers outweighs any First Amendment protection plaintiff may have in refusing to obey the order.

There is no evidence that plaintiff's statements made after the issuance of the notice of the disciplinary hearing were causally related to the discipline imposed. These statements were simply offered by plaintiff as part of his defense to the charge of insubordination.

#### 5. Conclusion

In accordance with the above discussion, this court finds that plaintiff has failed to produce evidence sufficient to satisfy a prima facie case of retaliation under the First Amendment. Defendants are entitled to summary judgment on plaintiff's First Amendment claim.

### C. Qualified Immunity

Defendants Lazaroff and Bogan argue that, even assuming that plaintiff has stated a viable First Amendment retaliation claim, they are entitled to qualified immunity in their individual capacities. Under the qualified immunity doctrine outlined in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), government officials are immune from liability for civil rights damages insofar as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. First the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation occurred. *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003). Second, it must be determined whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Id.* Third, the court must determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right. *Id.* The question of whether a defendant is entitled to qualified immunity is one of law for the court. *Dominque v. Telb,* 831 F.2d 673, 677 (6th Cir.1987).

To find that a right is clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir.1992). "Although it need not be the case that 'the very action in question has been previously held unlawful, ... in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). A right can be clearly established even if there is no case involving fundamentally or materially similar facts. *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002). An action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, where the general reasoning that a court employs, though not the holding, puts officials on notice, or when the premise of one case has clear applicability to a subsequent set of facts. *Id.,* 122 S.Ct. at 2516–17.

In the First Amendment employment context, courts have noted that because the *Pickering* analysis turns on a fact-intensive balancing test, it can rarely be considered "clearly established" for purposes of qualified immunity. *Fabiano v. Hopkins,* 352 F.3d 447, 457 (1st Cir.2003); *Moran,* 147 F.3d at 847; *Kincade v. City of Blue Springs, Mo.,* 64 F.3d 389, 398 (8th Cir.1995). Whether or not the defendants violated plaintiff's "clearly established" constitutional rights depends upon the *Pickering* balancing test. *Moran,* 147 F.3d at 845.

Thus, the relevant inquiry in a First Amendment case is whether reasonably competent officials could have disagreed on whether and to what extent the employee's speech was protected by the First Amendment. *Guercio v. Brody,* 911 F.2d 1179, 1185 (6th Cir.1990)(citing *Garvie v. Jackson,* 845 F.2d 647, 649–50 (6th Cir. 1988)). It is not enough that the *Pickering* balancing test was clearly established law at the time of the adverse job action. The court must determine, in light of the facts of the particular case, whether the plaintiff's "rights under *Pickering,* as opposed to whether the general teachings of *Pickering,* were so clear at the time in question that reasonable minds could not differ on the constitutionality" of the employment action. *Id.* at 1184. In other words, if an employer in the position of the defendants at the time of the adverse job action, measured objectively, could have disagreed as to: (1) whether and to what extent the speech was a matter of public concern, and (2) where the *Pickering* scale, with all of the parties' competing interests in the balance, would ultimately come to rest, then the protection of qualified immunity should be granted. *See also Moran,* 147 F.3d at 850 (plaintiff required to demonstrate "that her right to speak was so 'clearly established'—that is, that the *Pickering* balance so clearly weighed in her favor—that [her supervisor] could not have 'reasonably believed' that the State's interests in promoting the efficient implementation of the outreach plan and avoiding office disruption were sufficient to justify her dismissal.").

As discussed previously, this court has concluded that there was no First Amendment violation in this case. Therefore, defendants Bogan and Lazaroff are entitled to qualified immunity on that ground. Further, even assuming that a prima facie case of retaliation has been shown, plaintiff has not demonstrated that the *Pickering* balancing test so clearly weighed in his favor that the defendants should have known that they were violating plaintiff's constitutional rights. It would not have been clear to the defen-

dants, based on existing law, that the plaintiff's statements concerning his decision to exclude Reed from a leadership role, a decision made in his capacity as prison chaplain concerning a matter within the scope of his employment, would constitute a matter of public interest as opposed to an internal prison matter. Based on the circumstances of this case, reasonable officials in defendants' position could have questioned whether and to what extent plaintiff's speech was protected by the First Amendment. Plaintiff has also offered no precedent sufficient to put the defendants on notice that plaintiff's refusal to obey a direct order, based on his religious beliefs and his opinions on the scope of his authority as prison chaplain to determine how services should be conducted, would outweigh the state's interests in preventing discrimination against inmates and ensuring that employees comply with the orders of their supervisors, so as to tip the *Pickering* balance in plaintiff's favor. Again, reasonable officials in defendants' position could have disagreed as to where the *Pickering* balance would ultimately come to rest. *Guercio,* 911 F.2d at 1189. Defendants Bogan and Lazaroff are entitled to qualified immunity in their individual capacities.

## IV. Due Process Claim

■ Plaintiff also asserts a due process claim, arguing that the MCI regulations concerning discrimination based on sexual orientation were unconstitutionally vague. His argument centers on the fact that the defendants have been unable to produce a written regulation clearly proscribing discrimination against inmates. However, plaintiff was not charged with violating MCI's policy against discrimination based on sexual orientation. Rather, plaintiff was charged with insubordination, that is, disobeying the direct order of his supervi-

sor to permit Reed to serve as a choir director.

■ The void for vagueness doctrine only requires that the rule give fair warning of prohibited conduct. *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). Plaintiff was charged with a violation of Rule Number 6, insubordination, described as disobedience or inappropriate delay in carrying out the direct order of a supervisor. Ackridge Dep., Ex. 9. Plaintiff has admitted that he disobeyed the direct order given to him by Bogan, his superior. Plaintiff does not argue that the MCI rules on insubordination are vague, or that he did not understand the order. He was fully aware that he was refusing to follow a direct order, and that this conduct was plainly covered by the disciplinary rules.

Even assuming that the existence or terms of an MCI regulation or policy against discrimination could have been better supported, plaintiff was never charged with violating that policy. He does not indicate that a clearer understanding of the policy on his part would have altered his actions in any way or affected the outcome of the disciplinary proceedings. The evidence shows that plaintiff understood Bogan's position, namely, that excluding Reed from a leadership position in the choir based on his homosexuality constituted impermissible discrimination. Plaintiff refused to execute the order based upon his own religious beliefs. Plaintiff does not contend that he would have abandoned his strongly argued religious convictions and followed Bogan's order if the existence of MCI's policy on discrimination had been established to his satisfaction.

Plaintiff has not shown that he did not have fair warning of the nature of the conduct for which he was disciplined, and

defendants are entitled to summary judgment on his due process claim.

## V. Conclusion

The court finds that there are no genuine issues of material fact which preclude the entry of summary judgment in favor of the defendants in this case. In accordance with the foregoing, defendants' motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied. The clerk shall enter judgment in favor of the defendants. Plaintiff shall pay costs.