NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0147n.06

Case No. 22-1499

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Mar 30, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JIMMY E. MARSHALL, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| WAYNE COUNTY, MICHIGAN; WAYNE | ) | |
| COUNTY DEPARTMENT OF PUBLIC | ) | |
| SERVICES; DUANE RUSSOW, | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |
| | ) | |

Before: MOORE, THAPAR, and NALBANDIAN, Circuit Judges.

THAPAR, Circuit Judge. When Wayne County employee Jimmy Marshall refused to mop, he was suspended. And when Marshall was diagnosed with paranoid personality disorder, he was placed on medical leave. So Marshall sued the county and his supervisor. The district court dismissed the bulk of Marshall's claims and granted defendants summary judgment on the remainder. We affirm.

I.

Jimmy Marshall worked as a pump station mechanic at Wayne County's Downriver Wastewater Treatment Facility. The facility is unionized and had four mechanics, including Marshall. Of the four mechanics, Marshall is African American, one was Middle Eastern, and two were white.

Every Sunday, the mechanic on the day shift was charged with mopping the facility's operating-room floor, stairs, and balconies. One Sunday, Marshall was on the day shift but failed to mop. So Duane Russow, the mechanics' supervisor, left Marshall a note: "Jimmy, Please mop floor that you missed on Sunday[.] Thanks[,] Duane." R. 49-3, Pg. ID 821. Marshall read the note but still didn't mop.

In response, Russow wrote Marshall up for unsatisfactory performance and insubordination after consulting his own supervisor and the employee handbook. The handbook defines "insubordination" as the "[f]ailure to obey a direct order from a supervisor" and authorizes a five-day suspension without pay as the penalty for a first-time offense. R. 49-8, Pg. ID 1071–72. Marshall learned about the impending discipline from his union representative. The union representative and Russow then met with Marshall to discuss the incident.

At the meeting, Russow summarized Marshall's misconduct and asked Marshall why he hadn't mopped even after seeing the note. Marshall refused to speak to either Russow or the union representative. Stymied, they asked Marshall to sign a disciplinary form indicating Marshall's infractions and the penalty—a five-day suspension without pay. Marshall again refused to respond. So Russow and the union representative signed the form and noted Marshall's refusal to sign. Russow then suspended Marshall for five days. The meeting broke up about ten minutes after it began. Marshall could have challenged the result of that meeting by filing a grievance. He didn't.

While Marshall was suspended, Wayne County required him to undergo a medical examination. In that examination, psychiatrist Dr. Harvey Ager diagnosed Marshall with paranoid personality disorder. Dr. Ager concluded that the disorder required treatment before Marshall could return to work. At Wayne County's direction, Marshall applied for Family Medical Leave

Act ("FMLA") leave. During the application process, Marshall's own doctor, Brandon Karmo, confirmed Marshall's diagnosis in a medical certification. He too concluded that Marshall could not work until treated. Marshall never returned to work. Instead, he used his FMLA leave until it ran out, and then he retired.

About a year later, Marshall sued. His amended complaint alleged (i) a disparate-treatment claim under Title VII; (ii) equal protection, (iii) due process, and (iv) civil-rights conspiracy claims; and (v) a violation of the Americans with Disabilities Act ("ADA"). The district court dismissed Marshall's ADA and civil-rights conspiracy claims as inadequately pled. After discovery, the parties filed cross-motions for summary judgment, and the district court granted summary judgment to the defendants on the three remaining claims.

Marshall now appeals the grant of summary judgment on those claims and the dismissal of his ADA claim.[1] Since the ADA claim was dismissed, on appeal we consider only Marshall's operative amended complaint and documents referred to in the complaint and central to it. *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001). For the remaining claims, we review the evidence in the record.

II.

Marshall has not produced the evidence of disparate treatment needed to sustain his Title VII or equal protection claims. His due process claim lacks merit because defendants gave him all the process he was due. And since Marshall could not work until medically cleared, his ADA claim fails as a matter of law.

---

[1] Marshall also pressed his civil-rights conspiracy claim against a second individual defendant, Roshanda Brooks. A Wayne County human-resources employee, Brooks helped prepare Marshall's FMLA paperwork. Since Marshall didn't appeal the dismissal of this claim—the sole claim against Brooks—Brooks is no longer part of this action nor party to this appeal. R. 56 (Notice of Appeal) (omitting Roshanda Brooks as a defendant-appellee); Appellant's Br. IV–V, 2–4; Oral Argument at 9:39–9:49 (confirming that Marshall is no longer pursuing his claim against Brooks).

A.

*Title VII & Equal Protection Claims.* Marshall's Title VII and equal protection claims for disparate treatment both fail at the threshold. To prevail on either claim, Marshall must first show that (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was otherwise qualified for his position, and (4) he was treated differently than a similarly situated employee not of that class. *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 917–18 (6th Cir. 2014). Since Marshall fails to identify a similarly situated employee who received more favorable treatment than he did, he doesn't make it beyond this initial showing.

An employee is only similarly situated if he engaged in the same conduct as Marshall. *See Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019). So for these two claims to succeed, Marshall must identify another employee who (1) didn't perform his duties and (2) refused to correct course even after being warned. Marshall doesn't, so that ends these claims.[2]

Here, Marshall only identifies one employee as a possible comparator: Michael Crossman. Crossman, who is white, was also a pump station mechanic, and like Marshall, he sometimes failed to perform his duties properly. But Crossman is not similarly situated. When Russow asked Marshall to mop after Marshall neglected that duty, Marshall refused. Meanwhile, Crossman always corrected his errors whenever Russow asked. Since Crossman responded to Russow's prompting while Marshall did not, Crossman is not similarly situated.

So Marshall reframes the dispute. He argues that the disparate treatment wasn't the suspension, but rather that Russow gave Crossman a chance to improve his performance while denying the same opportunity to Marshall. The record doesn't bear this argument out. When

---

[2] Marshall doesn't allege that his placement on medical leave gave rise to Title VII or equal protection claims. Nor could he on this record, since he doesn't identify any similarly situated employees—that is, employees diagnosed with paranoid personality disorder or a similar illness—who weren't placed on leave.

Crossman cleaned poorly, Russow told him to fix his mistakes. And when Marshall failed to mop, Russow left Marshall a note to the same effect. Because Russow gave both Crossman and Marshall the chance to remedy their errors, this attempt to establish disparate treatment fails too.

True, Russow apparently directed Crossman to correct his errors orally, whereas he asked Marshall to do so in writing. But if that matters, Marshall doesn't explain why. The treatment of two employees need not be identical in every tiny detail. Rather, an employer simply cannot treat one employee "better" than another. *Johnson*, 942 F.3d at 331. And here, Marshall offers no reason why written notice was better or worse than oral notice. To the contrary, Russow's note was clearly written, and it was posted on an announcement board that Marshall checked three times daily. Marshall acknowledges that he received the note, and yet after five days, he still hadn't mopped. Thus, nothing in this record suggests that Russow's mode of communication made a difference to Marshall's or Crossman's compliance. So whether these reminders were written or oral doesn't matter.

Finally, Marshall makes one additional argument: that he was the victim of pranks and petty theft. For example, Crossman apparently once swapped Marshall's condiments for ketchup packets as a joke. Marshall also testifies that someone tampered with his locker and stole items from it.

The pranks and alleged thefts aren't enough to save Marshall's Title VII or equal protection claims. For one thing, they don't show the disparate treatment that these claims require. A disparate-treatment claim requires disparate treatment by the employer or supervisor—not by coworkers. And nothing ties these pranks and alleged thefts to Marshall's employer, Wayne County, or his supervisor, Russow. In fact, when Marshall told Russow about one incident, Russow instructed the employees to leave each other's food alone. And as for the tampering and

- 5 -

thefts, Marshall admits that he has no evidence of who the culprit was or what motivated these actions.

Nor do these actions show race discrimination in a more generic sense. While Crossman's condiment swapping may have been in bad taste, Marshall gives us no reason to believe the joke was racially motivated. Without more, the mere fact that Marshall is African American and someone pulled a prank on him isn't enough to raise an inference of racial animus. *See, e.g.*, *Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009) (explaining that something undesirable happening to a member of a protected class, without more, does not give rise to an inference that it happened *because* he was a member of a protected class). And as for the alleged tampering and thefts, again, Marshall admits that he has no evidence of what motivated these acts. So neither the pranks nor the alleged thefts show the racial animus needed to sustain his claims either.

Since Marshall didn't identify a similarly situated employee who was treated better on account of his race, we affirm summary judgment on his Title VII and equal protection claims.

B.

*Due Process Claim.* Next, Marshall claims that Wayne County and Russow violated his due process rights when they suspended him.

The Due Process Clause prevents deprivations of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. And the Supreme Court has held that tenured public employment is a form of property. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (recognizing the Due Process Clause applies to civil servants who have statutory for-cause removal protection).

But the Due Process Clause doesn't constitutionalize every employment decision. After all, the clause only applies when the employee has been "deprive[d]" of his property. U.S. Const.

amend. XIV, § 1. And not every suspension or other discipline is a deprivation of property. *See, e.g.*, *Gillard v. Norris*, 857 F.2d 1095, 1098 (6th Cir. 1988) (per curiam) (holding that a three-day suspension without pay does not trigger the Due Process Clause). Thus, before assessing the amount of process given, there's an antecedent question: was any process due at all?

Marshall asserts that his suspension triggered the clause's protections, and defendants do not contest the point. Therefore, we "assume that the suspension infringed a protected property interest." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (cleaned up).

So we next consider the process Marshall received. Under the Due Process Clause, the State must provide greater process for more severe deprivations. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). And this principle works in reverse as well. When a deprivation is less severe, the process required decreases. *See Gillard*, 857 F.2d at 1099. That rule resolves Marshall's claim.

If Marshall had been terminated, all that would have been needed is "oral or written notice of the charges . . . , an explanation of the employer's evidence, and an opportunity to present his . . . side of the story." *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004). The decisionmaker at this stage would not even need to be neutral, since any pre-termination bias can be cured through post-termination process. *Id*. at 595–97. And as for the process due after termination, we have repeatedly held that the opportunity to file a grievance is all that's required. *See Hudson v. City of Highland Park*, 943 F.3d 792, 801 (6th Cir. 2019). In fact, a grievance is such a significant protection that its availability post-termination further reduces the process required pre-termination. *See Kuhn v. Washtenaw Cnty*., 709 F.3d 612, 623 (6th Cir. 2013).

The process Marshall received met these standards. Pre-suspension, he was given "oral . . . notice of the charge," an "explanation" of the grounds for the discipline, and an "opportunity to present his . . . side of the story." *Farhat*, 370 F.3d at 595. Marshall's union representative warned

him about the impending sanction, Russow explained the charges, and Marshall was given a chance to respond. And while Marshall questions Russow's impartiality, he wasn't entitled to a neutral pre-termination decisionmaker. *Id*. at 595–97. Moreover, Marshall also had the opportunity to file a grievance after his suspension, a form of process so significant that it can satisfy due process requirements entirely. *See Hudson*, 943 F.3d at 801.

In short, defendants gave Marshall the process due an employee facing termination. And since Marshall was only suspended—a less severe deprivation than a termination—the process he received was more than enough.[3] *Gillard*, 857 F.2d at 1099.

To save his claim, Marshall attempts to brush this process aside as just a "sham." Appellant's Br. 44. Out of the gate, this argument stumbles. Marshall neither took advantage of Wayne County's grievance procedure nor offered any evidence challenging its integrity. That alone is enough to forfeit his entire claim. *See Farhat*, 370 F.3d at 596.[4] Post-deprivation procedures are what "ferret[] out" bias and corruption. *Id*. at 597. And by failing either to use his available post-deprivation process or show that it was a "sham," Marshall forfeited the opportunity to attack the integrity of his pre-deprivation process later. *Id*. at 596.

Even setting that aside, however, the two arguments Marshall gives for why the pre-suspension process was a sham are unpersuasive.

---

[3] *Mathews*'s balancing test identifies the exact minimum of process due in any particular case. *See* 424 U.S. at 335; *Loudermill*, 470 U.S. at 542–43 (citing *Mathews*, 424 U.S. at 335). However, the parties have not briefed how the test applies to Marshall's case, and since the existing caselaw resolves Marshall's claim, we do not address this unbriefed question. *See Gillard*, 857 F.2d at 1099.

[4] While the Sixth Circuit has often used "waiver" and "forfeiture" interchangeably, the two concepts are distinct. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Although *Farhat* uses the term "waiver," properly speaking, this is a forfeiture.

First, Marshall points out that the disciplinary meeting only lasted ten minutes. But the meeting only lasted ten minutes because Marshall refused to speak. When an employee refuses to take advantage of the process offered him, that's his fault, not his employer's. *See Kuhn*, 709 F.3d at 622 (citing *Buckner v. City of Highland Park*, 901 F.2d 491, 495 (6th Cir. 1990)). And if his refusal to participate results in an erroneous outcome, he has to live with it. *Id.*

Second, Marshall claims that the fact that Russow brought an unsigned disciplinary form to the meeting shows that the meeting's result was a forgone conclusion. It doesn't. All that's required in such a meeting—especially in light of the significant post-deprivation process that was available to Marshall—is "an explanation of the employer's evidence, and the opportunity to present his side of the story." *Gillard*, 857 F.2d at 1099. There's no requirement that an employer refrain from starting the paperwork until afterward. So this unsigned form by itself isn't enough to raise a triable issue of fact either. Given that the process Wayne County offered was more than sufficient and that Marshall offers no persuasive evidence of bad faith, the district court's grant of summary judgment was appropriate.

Finally, Marshall contends that he shouldn't have been suspended because he wasn't really insubordinate as defined by the employee handbook. This argument is beside the point. What matters for Marshall's due process claim is whether he received adequate notice and an opportunity to be heard. *Buckner*, 901 F.2d at 495–96; *see Kuhn*, 709 F.3d at 622. And he did. First, Russow reminded Marshall to mop. Then, Marshall's union representative warned him that he would be disciplined. Then Russow and the union representative met with Marshall and gave him a chance to explain his conduct. And then Marshall had an opportunity to file a grievance. In other words, Marshall's employer warned him about the impending sanction and gave him repeated chances to argue it wasn't justified. That's all the Due Process Clause requires.

III.

*ADA Claim.* Lastly, we turn to Marshall's ADA claim. The ADA protects only those individuals who can perform the essential functions of their job. *See* 42 U.S.C. § 12112(a); *id.* § 12111(8); *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 801 (1999). When a plaintiff cannot perform those functions, even with reasonable accommodations, the ADA's protections do not apply. *Pol'y Mgmt. Sys. Corp.*, 526 U.S. at 806.

One place where the ADA's protections don't apply is when an employee cannot work until being medically cleared. *See, e.g.*, *Gamble v. JP Morgan Chase & Co.*, 689 F. App'x 397, 402 (6th Cir. 2017). Thus, Marshall's ADA claim fails. His own doctor, Dr. Karmo, certified that Marshall's paranoid personality disorder required Marshall to be "off work until cleared by psych." R. 37-3, Pg. ID 619. And neither the complaint nor the certification identify any reasonable accommodations that Wayne County could have made in light of this diagnosis. In other words, Marshall couldn't work until treated or otherwise cleared. And since Marshall couldn't work— or, in the ADA's language, perform the essential functions of his job—the statute's protections don't apply.

At oral argument, Marshall conceded that the district court properly considered the certification. Ordinarily, considering a document other than the complaint isn't appropriate on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). But the Sixth Circuit has long recognized that courts may consider documents "referred to in the plaintiff's complaint and . . . central to h[is] claim." *Amini*, 259 F.3d at 502 (citations omitted). And as the district court correctly concluded, that rule applies here. *See* R. 40, Pg. ID 635 n.1 (explaining the district court's rationale for considering the form). The certification was part of Marshall's FMLA paperwork, and both Marshall's original

and amended complaint reference and rely on that paperwork. Thus, considering the certification was proper.

So rather than challenge the certification's inclusion in the record, Marshall instead argues it shouldn't have been considered. Why? Because the FMLA and ADA may define "disability" differently, and this certification was prepared for an FMLA application, not an ADA claim. This argument misses the mark. The certification matters because of the facts it contains, not because of any conclusions it makes about Marshall's eligibility for FMLA leave. Marshall's ADA claim could survive only if he had successfully alleged that he could perform the essential functions of his job. *Pol'y Mgmt. Sys. Corp.*, 526 U.S. at 806. And the facts in the certification demonstrate that he couldn't. The certification explains that Marshall had paranoia and had to be "off work" pending treatment. R. 37-3, Pg. ID 619. Since the complaint incorporated this document by reference, relying on the facts it contained was entirely proper, regardless of why it was originally created.

Finally, Marshall argues that we should give the certification little weight. The trouble for Marshall is that a court doesn't weigh evidence on a motion to dismiss. Instead, we accept the facts in the complaint and incorporated documents as true and view them in the light most favorable to the plaintiff. *Nolan v. Detroit Edison Co.*, 991 F.3d 697, 707–08 (6th Cir. 2021). And here, a certification from Marshall's own doctor—incorporated by reference into the complaint— says he couldn't work until treated. Taking those statements as true, as we must, Marshall didn't qualify for the ADA's protections.

\*       \*       \*

We affirm.

- 11 -